Case number 15-3027, United States of America v. Carlos Aguiar, also known as LOS Appellant. Ms. Hashimoto for the Appellant, Mr. Ewing for the Appellant. Good morning. Good morning. May it please the Court, Erica Hashimoto on behalf of Mr. Aguiar. The violation of Mr. Aguiar's Sixth Amendment right to public voir dire implicates the core fair trial guarantee of trial before an impartial jury. In this case, the judge decided to hold the voir dire proceedings, all of the individualized questioning of the panel members, in a back room, not set aside for trial. There were no members of the public in the room. And the entirety of the individualized voir dire happened in that back room. For those reasons, this Court should reverse the trial court's erroneous decision that his Mr. Aguiar's fair trial rights were not violated. In addition, because the district court erroneously held that Mr. Aguiar had not demonstrated ineffective assistance of counsel, this Court should remand for consideration of his ineffective assistance at pre-counsel issue. The core of Mr. Aguiar's fair trial rights were violated in ways that the court in Weaver recognized could lead to ineffective or I apologize, could lead to ineffective assistance for failure to raise a fair trial, public trial right. So let me ask you, the district court issued an opinion indicating what had happened after the fact. She made no findings prior to deciding where to conduct the voir dire. But we do know that she went to the largest courtroom in the courthouse and asked a number of questions while people were seated in the largest courtroom in this courthouse. So to that extent, could it be said that by her actions she was already making a determination that she was trying to ensure that all the defendants would have an opportunity with their lawyers and whoever else could fit in the courtroom to hear what was going on. Now, the separate part of going into the jury room, I don't know if you've seen the ceremonial courtroom, but conducting an individual voir dire, your brief says it was done for convenience. I agree, it was done for convenience, but it presented just geographically and physically a difficult problem. With respect to the back room issue, you're correct that the district court moved back there because of the comfort and convenience, and that's exactly what the court in Presley said is not enough. With respect to whether there were other accommodations that could have been made that would have preserved the comfort. So she, the district court then, in your view, was required to use a husher? Yes. That would have been one option. And at that point, what would another option have been? So it shows she could have kept it open for the parts that were not private and then used hushers for the questioning that was more sensitive. Well, I've been called for jury duty and there are a lot of general questions that you answer and that's what happened here. And then if you answer affirmatively to any of those questions, the judge questions you individually. So I just need to be clear here that in your view, the district court had no option other than to remain in the largest courtroom and use a husher. When no one objected, and to this date no one has claimed any of the interests that are involved were in any way sacrificed other than the point you make regarding his mother and sister. So a couple of points, Your Honor. First of all, I don't think that the district court needed to stay in the ceremonial courtroom. What it did was it had the panel members, most of them leave, and it kept small groups of them, which could have easily been accommodated in any of the regular district court courtrooms. It did not need the ceremonial courtroom for that. So the district court, where multiple defendant trial, has to move the individual part to another part of the courthouse, to a different courtroom? I'm trying to understand, I get the point and I understand what the Supreme Court's holdings are, but I'm trying to understand how we apply it in this context where no one objects. I think that there were a couple of options open to the district court. So to the extent that it wanted to keep it in the ceremonial courtroom and that courtroom was available, it could have done the individualized forward year in there. But it could also, if the ceremonial courtroom was not available, have done it in any of the other courtrooms because there's plenty of seating for the small groups. It also could have done exactly what it did as long as it made the requisite findings, right? That's exactly right. Because under Waller, it's not that there's a per se bar against doing what the district court did. It's that certain findings have to be made before the district court does what it did. That's your view of the merits of the public trial issue. That's exactly right. So had the court determined that there was no reasonable alternative and made the other requisite Waller findings, it could have done it in the back room. Go ahead. But then even if that's the case, then you still have to contend with Weaver, the recent decision in Weaver. And so Weaver tells us that in circumstances that are not markedly different from the circumstances of this case, there wasn't the prejudice prong satisfied under Strickland. If you assume, as the Supreme Court did in Weaver, that that encompasses fundamental unfairness. So the Supreme Court says on the facts of Weaver, there's not the type of fundamental unfairness that would require the granting of relief on collateral review. And what's the basis for drawing a distinction from Weaver since this case, at least in a good number of respects, is similar to the factual circumstances? I think there are three big differences. The first is that the district court here chose to remove it completely from the courtroom, the individualized voir dire. And there is part of the reason that there is a right to public voir dire is so that the public can see what's happening. This was completely removed in a way that it was not in Weaver. Second, and the Weaver court even noted that it was not in some secret back room in Weaver. Second, in Weaver, the rest of the panel was still in the courtroom. It was just a matter of nobody else could fit. Here, there was nobody, none of the other panel members were present. That takes away the gravity of the voir dire proceedings. But don't you have to show under Weaver that it made a difference, that this error, if it was an error, would have led to a different result? And that's a tough road to hoe, isn't it? And what have you done here to show that it's likely that there would have been a different result? I don't think we do need to show the likelihood of a different result. You don't think Weaver requires that? No. I think the fundamental unfairness, if you can show that it was a fundamental- I thought that's what Weaver was all about, is that we aren't going to presume that structural unfairness leads to a different outcome. You've got to show it. You've got to show it here. And what shows it here is the fact that the entire individualized voir dire was completely shielded from anybody. And where you have a violation that is so complete and egregious, Weaver, I think, leaves open that that can lead to a fundamentally unfair trial. Weaver recognized the difficulty of showing specific error here or specific- There has been no showing that the potential harms flowing from a courtroom closure came to pass in this case. For example, there is no suggestion that any juror- It's very specific, and I don't see where you've made that showing. You're telling us there's a problem with courtroom closure. There is a problem. But as I read Weaver, and maybe I'm missing it. Show me something else. Maybe I'm missing it. You have to show more than if there was a- You have to show how the courtroom closure led to a different result. The different result that I think we can show here is that there is a significant likelihood that the 12 jurors who heard Mr. Aguiar's case are not the same 12 jurors who would have heard the case had there been public voir dire. And that they would have come to a different result, right? Don't you have to show that? Only for standard Strickland prejudice. And the court's opinion in Weaver leaves open the fundamental unfairness analysis. So what- Go ahead. Please. So what you have here is, as I understand it, the fact that his mother and sister were not present to support him, your words, during the voir dire. But no allegation or argument that any of the four values were sacrificed here. And I think that's what Judge Griffith was exploring with you. Is that correct? I think that there is a sense in which the values underlying the right to a public trial are implicated here. And to be sure, there were not witnesses, in the normal sense, who were testifying during the voir dire, during the individualized voir dire proceedings. But what there were were individual jurors who were under oath. And Mr. Aguiar had every interest in ensuring that they were telling the truth and abiding by their oath. And the public nature of jury selection, just like the public nature of a trial, helps to ensure that those jurors were being truthful in their responses, so that his right to an impartial jury was protected during- I want to focus on this issue, just the basic architecture of what we're looking at. So as I understand, Weaver, you don't have to show- at least Weaver doesn't dictate that you need to show that the result would have been different in the sense that he would have been acquitted. So it's not that the result of the proceeding necessarily has to be different. Weaver sort of leaves that open and says, even if you don't have to show that, you still have to show fundamental unfairness. Yes. It's assumed you have to show fundamental unfairness. I take it in line with what Judge Griffith was asking, that in order to show fundamental unfairness, presumably you still need to show that there's been fundamental unfairness of the type that underlies the public trial guarantee and the sorts of things that the public trial guarantee is designed to protect, i.e. juror dishonesty, prosecutorial judicial misconduct, bias of the tribunal, the values that are protected by the public trial guarantee. With respect to that, the flaws in the process would have to manifest some way that would implicate those considerations. And it's unclear to me how the difference between the facts of Weaver and the facts of this case would implicate those considerations in a way that would suggest that we should reach a different result here with respect to fundamental unfairness than the Supreme Court did in Weaver. I think the Supreme Court's notation that fundamental unfairness could be shown for instance if the testimony of witnesses were taken outside of the public trial sphere, that that would be sufficient to show fundamental unfairness. Where you've got completely closed off, no members of the public at all. You still have a record. The record was still made. The record was still made, although that would be true even if a juror or I'm sorry even if a witness were testifying completely in a closed room. And for purposes of voir dire, the importance of things that do not show up in a transcript are really important. So all of the body language of the potential juror as he or she is answering the questions, the extent to which it looks like they are or are not telling the truth, all of that is the reason that there is the right to public voir dire. And because it was so categorically and completely shut off here, that I think is what leads to fundamental unfairness. Can I just ask you one question on your other claim? Yes. So there's the other one about the plea. Yes. With respect to that, there's an affidavit that says that had proper advice been given about the consequences of not accepting the plea, that had proper advice been given that he would have accepted the plea offer. Yes. Right. And so then the question becomes, there's the prejudice question and then there's also the deficient performance question. With respect to deficient performance, what's your view of what counsel should have done? Counsel should have advised his client what? Of the risks of going to trial, which is a mandatory life sentence. Which specific ones? What specific thing was not said that should have been? That there was the possibility of a mandatory life sentence if he went to trial. At the point at which trial counsel was advising Mr. Aguiar, it knew that the government was seeking 30-year mandatory minimum 924Cs. And it also knew from the plea offer that had been made, assuming that counsel had read it, that there was the possibility of more 924Cs. Those two facts in combination and the end. Where did the more come from? Because the plea offer was with one 924C count, right? Yes. And the plea offer also said that if the plea were turned down, more charges could be brought. So the government gave up its right to bring additional charges if he took the plea. Now in this case, the district court and experienced judge held a hearing to anticipate these types of collateral arguments. So there was an extended colloquy going on about did your client want to accept the plea. And the prosecutor, as I recall, mentioned that he may well be a career criminal. And given that there was this opportunity, and I understand the limits of what an individual defendant might say in the colloquy. Nevertheless, we have all this law on the colloquy. What was missing here? What was missing was an accurate assessment for him of what would have happened, what the potential risks were of going to trial. So what the- But could I just, what I'm trying to press you on is he had a plea offer with one 924C count. Yes. And you're not, as I understand your argument, suggesting that that plea as such was not adequately discussed with Mr. Aguilar, with his counsel. So he knew he was facing a trial on multiple armed bank robberies. He knew that the government could add charges if he did not accept the plea. Why should we presume that what the district court covered in the colloquy does not show either, does not show deficient performance at all? What Mr. Aguilar was told at that January hearing, and the plea offer had already expired at that point. So in some ways that colloquy is irrelevant because the government had said that the plea offer was no longer open. But what he was told was that if he went to trial, he was looking at 457 to 481 months. That's Appendix 177 to 178. That's 38 to 40 years. What government counsel had also said was that if he took a plea, if he had taken that plea, he was looking at 430 to 447 months, which is 36 to 37 years. So what he heard at that January colloquy was that if he took the plea, he would save himself two years, or at most three. And if he went to trial, he was looking at 38 to 40 years. Given that understanding, he would have no reason to take the plea. He didn't know. There was nothing. That became clear with the 924C, didn't it? The government was not offering him a walk here. The government definitely was not offering him a walk. But what nobody ever explained to him on this record is that if he went to trial on those two 924Cs, he was looking at a mandatory life sentence without parole. And there's no... Somebody should have asked, did your counsel tell you that the second 924C will entail another mandatory minimum of 25 years? Should it have been that specific? It should have told him that he was looking at a mandatory life sentence with the two 924Cs. The second 924C would have resulted in a mandatory life sentence. Well, as far as we know, he wasn't even... And all we know is what's in the affidavit, because the district court has seen those facts to be true. We don't even know that he was aware of the possibility of a second 924C. That's correct. So he wasn't told about the possibility of a second 924C, and he wasn't told about the sentencing consequences of the potential second 924C, which would have been mandatory life in prison. That's exactly... That's what Mr. Aguiar's affidavit would suggest. That's exactly right. And so not knowing that he was looking at mandatory life at trial, he couldn't adequately assess the risks or benefits of going to trial or taking the plea. Why don't we hear from the government? We'll give you some time on the phone. Thank you. Good morning. Good morning, Your Honor. May it please the Court, James Ewing for the United States. As this Court's questions pointed out, Weaver defeats appellant's courtroom closure claim because he can't show Strickland prejudice. We know from Weaver that Strickland prejudice is not shown automatically when a courtroom closure claim is raised in an ineffective assistance of counsel context. An appellant doesn't even attempt to show traditional Strickland prejudice that is a reasonable probability of a different result at trial, nor could he show that. Is that what he needs to show? You say under traditional Strickland. After Weaver, does he need to show that, a different result in trial, different outcome? Yes, Your Honor. Weaver assumed for the sake of that argument that there is a second way that you can demonstrate Strickland prejudice, that is to show a fundamentally unfair trial in the courtroom closure context. We don't believe in – so Weaver didn't really pass on that. It just assumed it for the sake of argument. We believe that under Gonzales-Lopez and cases like that, a Sixth Amendment ineffective assistance of counsel claim is not complete unless and until the appellant can show a reasonable result of a different – a reasonable possibility of a different result at trial. But even if you assume for the sake of argument, as Weaver did, that there's this second way to show Strickland prejudice, which is really all appellant has here, then this still was not fundamentally unfair. It's interesting. Weaver talked about four different aspects of why what happened in that case, which was a complete closure of the voir dire process, was not fundamentally unfair. One, appellant's trial was not conducted in a secret or remote place. Trial, same here. Two, the closure was limited to the jury voir dire. Same here. Three, the court remained open during the evidentiary phase of the trial. Same here. Months, months of evidentiary presentation of the evidence in this case. Every day was open to the public. Four, there was a record made of the proceedings that does not indicate any basis for concern other than the closure itself. And that was Weaver talking about the fundamentally unfair aspect, which, again, it just presumed for the sake of argument. All those factors are here as well. And so for the same reasons that the closure in Weaver did not render that trial fundamentally unfair, this trial wasn't fundamentally unfair either. I didn't read you to be pressing the argument that we ought to affirm on the basis that traditional strickland prejudice is required. I thought your argument really was that if we take up the question in the same way that the Supreme Court did in Weaver, in other words, assuming that there's a fundamental unfairness way to prove strickland prejudice as opposed to the result would have been different way to prove strickland prejudice, that you still win. We do. We win either way, Your Honor. And that is our submission. But just as Weaver did, you know, we do quarrel a little bit with the fact that you can show strickland prejudice in some other way other than showing a reasonable probability of a different result. Now, there's a... We don't quarrel with that. But the Supreme Court already decided a case that at least didn't dictate that we accept that conclusion. It specifically addressed the case on the hypothesis that fundamental unfairness is a way to prove strickland prejudice. I agree, Your Honor. That it... Weaver presumed that. It didn't really pass on the question specifically, but... No, but, I mean, otherwise it's an impossible burden to meet. I mean, how could you show that just because a part of the voir dire was closed that you would have been acquitted? I mean, you know, you can hypothesize an extraordinary set of circumstances, but otherwise it's an impossible burden. So I thought that's what the Supreme Court was getting at. It's fundamentally unfair. This is a structural guarantee. And so a court might just conclude that if you're going to hold the entire individual voir dire in a back room where no one can see what's going on, who's a member of the But, you know, that's just an unfair situation. Fundamentally. It's inconsistent with our system of justice. And, Your Honor, you can presume that as the Supreme Court did in Weaver, and we still win for those same four factors. But, you know, the Court has looked at this in cases like Cronic and Powell v. Alabama, and they've looked at it in the situation of something that, where, you know, maybe the appellant couldn't show a reasonable probability of an acquittal, for example, but it's akin to a complete deprivation of counsel. And something that rises to that level, you know, it's not worth it to litigate the issue. Yeah, I learned Presley was half a day. All right? So the Supreme Court had a problem with that. Okay. That's all I'm trying to get at here. And I thought that's what Weaver was trying to acknowledge. Well, I think what Weaver was saying was that, you know, and Weaver was talking, it's interesting that Weaver said, you know, we're just talking about the closure of Waudeer. But if you look at the closure, just the Sixth Amendment right to a public trial generally, you could easily consider and think about a much more extreme example where, for example, you know, the entire trial was closed or held in, you know, some secret location. So the fact that his mother and girlfriend were not present during the Waudeer and the fact that there was some discussion of evidentiary motions in this back room, that that's simply not enough to tip the balance. It has to be almost a smoking gun as to one of the four values that is at stake here. We think that's right, Your Honor. I mean, yeah, I mean, that was the teaching of Weaver is that, I mean, before Weaver, there was a circuit split on whether he even had to show prejudice at all. And so now we know the answer to that question. You have to show prejudice. He hasn't even tried to show the traditional strickling prejudice. And just to be clear, he couldn't show that. The government presented DNA stills from videos from these bank robberies. Which would have been equally true on direct appeal. Right. That's true. Even on direct appeal, he would have won. Well. Even if it hadn't been raised at trial. And so, I mean, that's what Weaver wrestled with, which is all of what you say might be exactly right. I mean, that's the dilemma with structural error and collateral review. I agree, Your Honor, too. I guess I'll quarrel a little bit with, I mean, I think if this would have been a preserved error, he certainly would have won under Presley v. Georgia. Even if it was unpreserved, plain error would apply. Right. But I don't know that we know that he wouldn't prevail on direct appeal under a plain error standard for a structural error. We believe he likely wouldn't prevail based on a number of factors. But the court doesn't need to reach that here. You know, just going back to Judge Rogers' question about these other issues that were covered during the void-hear process, I guess we'd say a number of things about those. One, the district court judge was not making rulings in the back room or litigating motions. Federal Rule Criminal Procedure 43b-3 says if you're just talking about the law, then the defendant doesn't even have to be there, much less the public. And the normal way that we see that is, for example, in a jury instructions conference or something like that. But secondly, if you look at, for example, the DNA issue that was discussed a little bit in the room, look at docket entries 257, 259, 283, and then finally docket entry 305. These are public filings from both sides on this DNA issue. The issue was what would the government be allowed to present regarding the DNA return in this case. And docket entry 305 is the district court's published opinion about what they would be able to do. So this was not some sort of secret litigation that was going on in the back room. This was fully fleshed out on the record. And if you look at kind of the last day of individual void year, and I believe it's actually the next morning, so the April 12th, and this is the April 12th transcript at 1037-1044, 1046-1052, they're discussing these issues in open court on the record. So there's nothing inappropriate about that aspect of what went on. It's actually in the jury room behind this hearing. Can I take you to, unless my colleagues have further questions on this issue, can I take you to the other ineffectiveness of the counsel claim? Yes, Your Honor. So did you take issue with the proposition that counsel generally should advise a defendant about charges that might be brought if a plea offer is not accepted? Well, no to the extent, but this court said in booze that it's ineffective assistance of counsel in the Laffler versus Cooper context and the plea context to say, to give a plainly incorrect estimate of, you know, the likely sentence. And it's difficult to be clairvoyant about each and every charge that might be coming down the pipe. I mean, I think there's a continuum, right? Sure. And I think Strickland's deficiency problem accounts for that because it just has to be reasonable. You're right. You don't need clairvoyance. But if there are things that are sufficiently in the offing that aren't discussed with a client, then that can be ineffective assistance of counsel because the declining of plea without that information in mind turns out to be a terribly bad decision. And we already know that from Padilla because you have to discuss immigration consequences. You can't be clairvoyant about those either. What? Well, Padilla talked about the concept of something being readily known. And in that case, you know, there was a list of deportable offenses that was readily known. I know, but the argument that counsel makes is perfectly obvious what was going to happen here. Did you? Well, I mean, I think there's kind of a way to short circuit this, Your Honor.  What's interesting about that transcript is that that was after the initial superseding indictment came down in November where appellant was actually charged with multiple 924C offenses. So at that point, there's no reason to be clairvoyant about what's coming down the pipe. It's already come. Well, there's a question about whether the plea offer was even on the table at that point. I think it was gone. But as I read your brief, you're not talking about deficient performance. Your brief on this issue is about prejudice. Well, I mean, we believe we went on either prong. But where did you make an argument about deficient performance? Well, the deficient performance aspect was that you don't have to be clairvoyant about every charge that's coming down the pipe. I believe it's on the last page of our brief. I believe it's on footnotes. Right. So it's the very last page of your brief on a footnote. You talk about deficient performance. The rest of the argument is all about prejudice, as I read it. And even on the last page in the footnote, I didn't even read you actually to be taking a position on deficient performance. You just made a point that there aren't decisions that necessarily show that there's deficient performance here. And then you say if the court disagrees and believes that whether counsel read a deficient performance as dispositive, the appropriate course would be remand in order to determine what advice, in fact, was dispensed. Well, the reason we would ask for a remand and the alternative is because we actually think it's unlikely that it wasn't. Sure. And you may well be right about that, that maybe actually the affidavit is wrong and counsel, in fact, did tell Mr. Aguiar about the things that he should have known about. But your brief is about prejudice, not about deficient performance. Right. I mean, I agree that we think prejudice is kind of the obvious way to resolve this issue. Right. And I just don't understand what argument you, in fact, made. The only place I saw a deficient performance argument being made at all, to the extent it was made, I'm not sure it was, but is in that footnote. That's correct, Your Honor. Okay. I agree with that. So really, other than the last footnote on the last page, which maybe makes a deficient performance argument, but maybe not, I think I'm on the maybe not side of that, but we can argue about that. Your brief is about prejudice. It is. And on prejudice, how is it not prejudicial? Because if there are 924C counts that could be brought and the sentence would be mandatory life imprisonment, shouldn't the client know about that in deciding whether to accept a plea that would get him a sentence other than mandatory life imprisonment? Well, a couple of responses to that, Your Honor. If you look at the January 31st colloquy, and we'd say, you know, yes, the plea was, I think, technically off the table at that point, but the district court talked about the fact that the Booker decision had come down in the interim. Also, the DNA evidence had come back in the interim. So she was saying, look, I want to talk about the pleas that were on the table. I understand that they may not be, you know, re-extended at this point, but I just want to make sure that you all understood what the plea was and the state of affairs is now. And what's interesting is that this is Joint Appendix page 176. Aguiar's counsel said that Aguiar had rejected the government's offer then, and he's rejecting it now, meaning that even in the face of these 924C counts, he's rejecting the government's plea offer. And one part that we think is important. But that doesn't tell us what Aguiar's counsel told Aguiar, which is what's relevant. Aguiar's counsel could stand up there and say all kinds of things, but unless there's been the relevant advice dispensed to the client, the client's claim is my counsel was ineffective because I didn't know. I wasn't made aware with the benefit of my counsel's advice that I faced life imprisonment if I forewent the plea offer. Joint Appendix 177, Your Honor, the district court asked Aguiar's counsel, have you advised him in terms of 924C and what that involves? And Appellant's counsel answered yes. Joint Appendix 166. And that's your argument on the footnote, which is that's why we need to revamp, because if the advice, in fact, was given, then the government wins. But we went on prejudice because he can't demonstrate that he – first of all, he mischaracterizes what the government's plea offer actually was. And now he – it's easy to say now that he would have accepted a plea since he went to trial and got it. In which way is it mischaracterized? Well, he calls it a – at some point he calls it a five-year plea, a ten-year plea. In the brief, it's a 30-year plea, and it's colloquial. It wasn't a 30-year plea. It was a 30-year mandatory minimum sentence on the 924C plus a plea to the RICO count, which was the top count of the indictment, which by itself would have carried another 17 to 21 years. So the government's plea offer was a plea offer to the bottom – the low end of the guidelines would have been 47 years. And Appellant simply can't show that he would have given up his right to go to trial. Wait, so suppose – is that right? Because suppose that it's undisputed. It's undisputed that everybody knew that there would have been a second 924C, which would have carried a mandatory life in prison if the plea were rejected. Okay, and then the plea offer only has the sentences that you just outlined. Isn't it still prejudicial? Well, no, Your Honor, because the – and life in prison is not prejudicial? I guess a couple of responses to that. One, Joint Appendix 164, granted it was in the context of one of his co-defendant's colloquies. On the same day, same day, January 31st, it was in the co-defendant Perkins' colloquy. The government said a conviction for more than one 924C carries mandatory life. He's sitting right there at counsel table, so he's on notice that that's the truth. Also, that seems to be proving the point because it says that knowing about mandatory life is important. But he knows by that point he's already been charged with two 924C counts, and he's still saying that he would— But that goes to the reason that we need to remand. First of all, that colloquy wasn't with Aguiar, right? The life sentence was not. Right, so it was a co-defendant. Are there any cases that say that one defendant is supposed to listen intently to a colloquy with a co-defendant, and therefore this defendant is presumed to have all the knowledge that comes out of a colloquy that deals with a co-defendant? No, that's not what we're maintaining. But if you look at the way that—I mean, his colloquy was only about five or six pages later. And the way that they're talking about the 924C kind of goes throughout the whole process. So we think that—I mean, the issue is whether he was on notice of this, and we think that that demonstrates that he was on notice of it. But, you know, it's interesting to see what happened when he— But that goes to division of performance. Excuse me, Your Honor. That goes to division of performance. I'm not—first of all, the plea offer's gone at this point. We've already talked about that. We're at a hearing where the—I think the government is the one that said that if you don't accept our plea by such and such date, the plea offer's gone. Right. So the relevant question, it seems to me, is whether counsel was effective before that date. Because, well, after that date, the plea offer's gone. So the question for the client is, do I have the right information with which to make an informed decision about accepting a plea by the deadline? And the affidavit says, I was never told that there was the possibility of a second 924C in mandatory life had I rejected the plea. A couple of responses to that, Your Honor. I understand Your Honor's question, but the first problem with the affidavit is it mischaracterizes what the plea offer actually was. So that goes to prejudice because it goes to the idea that he wouldn't—he can't—it's easy to say after you go to trial and you get 60 years. Incidentally, he was acquitted of the mandatory aspect of the 924Cs and was found guilty only of possessing two semi-automatic weapons, which is an example of why you might want to go to trial and put the government to its burden of proof. I don't see how that helps your argument. I didn't understand it in the brief either. Well, in the sense of—what we really have here is kind of— now he wants to say that he would have taken a plea that the low end of the guidelines was 47 years. I guess what we're focusing on is that, you know, when the prosecutor talks, well, he may be a career criminal and all those—you know what that means. The district court knows what it means. Does the defendant know what it means? Did anybody tell him, look, you're facing life? Well, what the trial counsel—or excuse me, what the prosecutor actually said, and this is Joint Appendix 177 to 178, appellant may very well be a career criminal offender, and she didn't stop there. What she said was that means just on the RICO count alone, you're looking at 360 months to life. So suppose this happens. Suppose that the counsel gives the advice to a client that says, the charges you face if you accept the plea have a minimum guidelines that equates to 47 years. Let's just suppose that happens. But then it turns out counsel's wrong and it actually carries mandatory life. And then the person brings an ineffective assistance of counsel claim after the fact and says, wait a minute. Had I known it was mandatory life, I would have never accepted the plea. I was told by my lawyer it was a 47-year guideline. I think any court would say the prejudice wouldn't be established. Meaning if you go to trial, the worst you could get was— If you accept the plea. Right. So the counsel tells a client, accept the plea because as I'm calculating the guidelines, your sentence is going to be 47 years. And the client says, all right, I'll take the plea. And then it turns out, actually, that the sentence is mandatory life. I think the government would even concede that in that situation there would be prejudice. And there was a similar case. That was the White case that they cited, which I think was the unpublished case. How about the Lee case? Why haven't you all mentioned Lee? Doesn't the Supreme Court's recent decision in Lee deal directly with what prejudice is in this very setting and tells us that post hoc arguments don't mean anything? There's got to be contemporaneous evidence that the decision would have been a different decision had that information been presented. And isn't your argument that Aguiar has not made that showing here, that there would have been a difference? Or am I misunderstanding? I will confess to not knowing the Lee case off the top of my head, but the premise that you're presenting is that's what we're arguing, is that it's easy to say after you go to trial and are convicted and have a 60-year sentence that you would have taken a plea offer that included a 47- to 51-year guideline sentence. But to give up your plea, to give up your right to put the government to its burden of proof in exchange for a We have an affidavit that said he would have made a different decision, and the district court didn't counter that. But it may be true. I mean, maybe if we remand and the district court disagrees with the affidavit, that's one thing. But we take the case on the record that's presented to us, and the district court didn't dispute that at all. It took the affidavit as a given. And you're not defending that. You're not defending the district court. But what the district court took as a given was that he had not been told about these multiple 924-C counts. The district court did not take as a given. And, in fact, in footnote 6 of Agri-R1 talks about the fact that the problem with saying, I would have taken the plea, she didn't take that as a given because she says But she didn't dispute it either. In other words, I mean, I didn't read you to be arguing that we ought to decide the case on the basis that he wouldn't have that he's wrong in his affidavit in saying that he would have accepted the plea. We do believe that was wrong, and the reason why is because he mischaracterizes the government's plea offer in the affidavit. But the fact that he mischaracterizes his pejorative, he might have gotten it wrong, but the fact that he has gotten it wrong doesn't tell us that he's wrong in saying he would have accepted the plea. We don't know, do we? I mean, can we actually say on this record that we know because he's not getting the sentencing range exactly right in his affidavit that we should say that actually he wouldn't have accepted the plea? How do we know that? Joint Appendix 176. He's rejecting the plea then, and he's rejecting it again now. Even in the face of the 2924-C counts. I think we've explored this. Thank you, Your Honor. We would ask that you affirm the judgment of the district court. All right, thank you. I'll give you a couple of minutes. Thank you, Your Honor. May I ask you about Leed? Yes. Leed deals directly with prejudice. Let me read you from the Chief Justice's opinion, just two sentences. Court should not upset a plea solely because of post hoc assertions from defendant about how he would have pleaded but for his attorney's deficiencies, and this is the key sentence. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences. What is the contemporaneous evidence here that would suggest that Aguiar would have acted differently had he been told? Could I just interject? Are you familiar with Leed? Because it wasn't cited by any of the parties. I have not read it. In Leed, there was an evidentiary hearing on this issue, so we don't have an evidentiary hearing here. So that would be one way of distinguishing if you haven't read the case. But nevertheless, there's no allegation, I think, would be the response that Judge Griffin is focusing on about contemporaneous evidence other than beyond what Judge Chinavasan was exploring about what advice did he actually receive. That's correct. And what we have so there is certainly the affidavit that gives rise to the need for an evidentiary hearing to figure out what he was told at the time, and that would be the contemporaneous evidence. But the transcript itself demonstrates to the extent that the January transcript is relevant at all, what it demonstrates is that he was given incorrect information about his risks if he went to trial. What he was told at that January hearing or what the government put on the record at that January hearing was that if he went to trial, he was looking at 38 to 40 years, whereas if he took the plea, he was looking at 36 to 37 years. Well, but what we're focusing on here, counsel, is what advice did he receive from his own attorney before the plea expired. And we are also told by the Supreme Court that we must indulge in presumption that counsel knows what the law is and acts accordingly. We don't presume that counsel has acted, failed to live up to his or her responsibilities. I thought that was partly why the government just added that footnote at the end as opposed to making the arguments of the prejudice issue here. And Lee would get you a hearing, I suppose. Yes, and that's what needed to happen here. 2255B says that the district court shall hold an evidentiary hearing unless the record conclusively shows that he's not entitled to relief. Between the affidavit, his affidavit where he says his counsel told him that he was looking at 30 years on the plea and didn't explain the risks of going to trial, and the fact that we now know that he was looking at mandatory life at trial, gave rise to the need for an evidentiary hearing. As I understand it, the affidavit is evidence of what was happening contemporaneously. Of course it's going to come up after the fact. That's how trials work. We always ask about things that happened previously. And the way we get evidence about what happened previously is people testify or we get an affidavit. That's right. And the affidavit was about what happened at the relevant time. That's right. And what he says in his affidavit is his counsel told him it was a 30-year plea offer and that nobody explained to him the risks of going to trial. And given that, there has to be an evidentiary hearing. Now, that might be totally wrong. It could happen. If there's a hearing, it could be that the judge finds that actually what he's saying in the affidavit is just wrong. He actually did get the advice. And counsel, usually what happens in these cases, as I understand it, when an effective distance to counsel is alleged, is the counsel testifies about the nature of the colloquy. And counsel might well prove to the district judge, if the case goes forward, counsel might well prove to the district judge that, in fact, the advice contemporaneously was given in a way that the affidavit doesn't accurately account for. That's exactly right. So what do we do with the district court's effort to explore all of these efforts, at the hearing? I mean, she's asked counsel, what did you tell? Did you discuss the plea? Did you talk about 924? She asked the defendant, did you understand all this? Do you have any questions? Yes, but there's nothing in that record that demonstrates that he was ever told that he was looking at a mandatory life sentence. And so counsel says yes to the very general question, did you explain? Also, in rejecting the client's, Mr. Aguiar's argument, the district court didn't make any findings about what, in fact, what advice, in fact, was given. That's exactly right. She rested her decision on a different rationale, which is that given that there was no 924C count in the indictment, as it existed at that stage, that there couldn't be a problem here. That's exactly right. And so we don't know. It's true that the colloquy occurred, the record shows that the colloquy occurred in the way that your colleague from the government says, but the district court, as far as I read, didn't make use of that because the rationale that the district court adopted in rejecting the claim was different. That's exactly right. The district court ruled only on the ground that because the 924Cs had not been indicted at the time Mr. Aguiar rejected the plea offer, that counsel could not have been deficient in failing to discuss that. You point out there's no such rule. All right. Thank you, counsel. Thank you. We'll take the case under advice.
judges: Rogers, Griffith, Srinivasan